**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Kellie Frelick,

     Plaintiff,

     v.

Princeton Enterprises, LLC d/b/a
Princeton Management, and
Alejandra Orozco, jointly and
individually,

     Defendants.

Case No. _____

Hon. _____
United States District Judge

Hon. _____
United States Magistrate Judge

**COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF**

This is a civil rights action arising from the sexual assault of Plaintiff Kellie Frelick by her apartment building's maintenance technician. The assailant was already a known problem for Princeton Management and had been moved to Ms. Frelick's apartment complex after his dangerous conduct and poor work performance caused him to be reassigned from his first apartment building at Princeton Management.

At Ms. Frelick's complex, this man played on her sympathies to gain her trust and then drugged her and assaulted her in her home. When she reported this assault to her on-site property manager, nothing happened for over week,

1

and then the Area Director, Defendant Alejandra Orozco, refused to believe Ms. Frelick. Instead of terminating the assailant, Princeton Management and Orozco reassigned him to another apartment complex, all while failing even to remove his key access to Ms. Frelick's apartment complex.

A year later, this same maintenance technician struck again, sexually assaulting another individual at the new apartment complex to which he was assigned, and causing another resident to file a police report that he was stalking her. Even worse, Orozco directed staff *not* to report these incidents to the police.

What did Princeton Management and Orozco due in response? They reassigned him to a fourth apartment complex in as many years. Princeton Management and Orozco have yet to terminate this individual and has left him with keys and access to all the buildings where he has worked. Kellie Frelick has been traumatized, and lives in fear that this man will attack her again and that she is fundamentally unsafe in her home of over 10 years.

## PARTIES, JURISDICTION AND VENUE

1. Kellie Frelick is a long-term tenant at Embassy West Apartments in Waterford Township, Michigan, which is in the Eastern District of Michigan.

2

2. Princeton Enterprises, LLC d/b/a Princeton Management, owns and operates numerous apartment complexes, including the Embassy West Apartments. It is a Michigan Corporation with its headquarters in Southfield, MI, which is in the Eastern District of Michigan.

3. Alejandra Orozco is a resident of Warren, Michigan, which is in the Eastern District of Michigan.

4. This Court has jurisdiction over Plaintiff's claims arising under the Fair Housing Act, 42 U.S.C. § 3601 et seq., pursuant to 28 U.S.C. § 1331.

5. This Court has supplemental jurisdiction over Plaintiff's claims arising under the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq., pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy.

6. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b)(2) because all parties reside in this District and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

**FACT ALLEGATIONS**

7. Plaintiff Ms. Frelick is a long-term tenant at Embassy West Apartments, located in Waterford, Michigan 48327.

8.  Defendant Princeton Enterprises L.L.C., doing business as Princeton Management, is a Michigan limited liability company with its headquarters in Southfield, MI 48033.

9.  Princeton Management operates a portfolio of over one hundred residential apartment communities across multiple states, including Grosvener Apartments, Embassy West Apartments, Fox Pointe Apartments, and Pine Lake Apartments, all of which are in the Eastern District of Michigan.

10.     Dennis Rae Hill is an individual who at all relevant times was employed as a maintenance technician by Princeton Management.

11.     At all relevant times, Hill resided on site at the Princeton Management property where he worked during the periods of his employment at those properties.

12.     At all relevant times, Alejandra 'Alex' Orozco served as Area Director for Princeton Management with supervisory authority over Embassy West Apartments, Fox Pointe Apartments, Grosvener Apartments, and Pine Lake Apartments.

13.     As the Area Director, Orozco exercised final authority over the handling of resident complaints across all properties within her portfolio.

14.     Orozco has stated openly to employees that she is "corporate" and that nothing within her portfolio would be escalated without her approval.

15.     At all relevant times, Kimmy Stamper served as property manager at Embassy West Apartments.

16.     At all relevant times, Jeanette Nogueras served as property manager at Fox Pointe Apartments.

17.     Dennis Hill began working for Princeton Management as a maintenance technician at the Grosvener Apartments.

18.     Princeton Management and Orozco transferred Hill from Grosvener Apartments to Embassy West Apartments due to behavioral issues, including obscene, threatening, and boisterous arguments with coworkers, residents, and management.

19.     Princeton Management assigned Hill as maintenance technician at Embassy West Apartments in or around mid-to-late 2023.

20.	Princeton Management granted Hill access to apartments through a main-door key, and an office key.

21.	The property management offices have unsecured key storage closets that allow anyone with the office key to gain access to the keys for each resident's apartment.

22.	The key storage closet unlocked in the property manager's office.

23.	Thus, Hill had keys for both the exterior building entry door, and the property office, and through that access to the office, also to the individual unit doors of every resident at Embassy West Apartments.

24.	Princeton Management's on-site property manager, Ms. Stamper, and Area Director Orozco received multiple resident complaints concerning Hill's attitude, behavior, and work ethic at Embassy West Apartments prior to Hill's sexual assault of Ms. Frelick.

25.	While at Embassy West, Hill cultivated personal relationships with residents and sought to elicit their sympathy by representing to Ms. Frelick and others that he had no friends, family, or money.

26.	On January 28, 2024, Ms. Frelick — a longtime resident who believed Hill to be lonely and new to the community— invited him into her home to gift him a box of food items ahead of Super Bowl Sunday.

27.     During that visit, Hill asked Ms. Frelick for a ride to a nearby store to purchase a 12-pack of beer, and Ms. Frelick obliged.

28.     After the trip to the store, Hill persuaded Ms. Frelick to invite him in to have a beer.

29.     At some point, Hill slipped a drug into Ms. Frelick's beer without her knowledge.

30.     After just the one beer, Ms. Frelick became disoriented and lost consciousness on the floor of her living room.

31.     At some point during the hours that followed, Ms. Frelick regained consciousness to find Hill choking her and groping her body, before losing consciousness again.

32.     Ms. Frelick's son Dylan called Ms. Frelick's phone, Hill answered and Dyan heard him mother in the background sounding weird.

33.     Hill told Dylan that Ms. Frelick was not feeling well.

34.     Dylan explained that he was on his way home but didn't have his house keys with him.

35.     When Dylan returned home, he attempted to call Ms. Frelick's phone repeatedly to get her to let him in, but there was no answer.

36.     Dylan appeared at the apartment, but there was no answer at the door and he did not have a key.

37.     Dylan wound up spending the night at his father's home.

38.     When Ms. Frelick regained consciousness the following morning, her clothing, body, and hair were soaked with urine and vomit which, based on their location on her body and the absence of any ill taste in her mouth, she believed were not her own.

39.     Ms. Frelick immediately contacted Bernice Trevett, a close friend, employed as a housekeeper at Embassy West Apartments, who lives nearby, to tell her what had transpired.

40.     Shortly thereafter, Ms. Trevett and Dylan accompanied Ms. Frelick to the Waterford Township Police Department to file a report.

41.     When questioned, Hill initially denied ever going to the store, purchasing alcohol, or entering Ms. Frelick's home.

42.     However, footage from the store showed him going in to purchase alcohol.

43.     Once the footage was obtained, Hill admitted that he had been in Ms. Frelick's home and had drunk beer there.

44.     When Ms. Frelick and Trevett reported the assault to Stamper in the Embassy West management office on January 29, 2024, she stated that there was nothing she could do until Orozco returned from vacation.

45.     As a result, Ms. Frelick was forced to live at Embassy West apartment for weeks with her assailant, Hill, living and working there.

46.     Ms. Frelick was absolutely terrified and traumatized by the failure of Princeton Management's on-site staff to take any immediate action to protect her or even investigate her allegations.

47.     Even after Orozco returned, Hill faced no consequences from her or from Princeton Management and continued to live and work at Ms. Frelick's apartment complex for approximately four weeks following the assault.

48.     In February of 2024, Orozco transferred Hill to another property, the Fox Pointe Apartments, with no discipline.

49.     Orozco repeatedly challenged Ms. Frelick's claim and refused to believe her.

50.     Ms. Frelick, for her part tried for nearly six months to obtain a report from the Waterford Township Police Department, but staff changes and other delays thwarted her efforts.

51.     Ms. Frelick preserved the clothing she wore that night and the hat Hill left behind in her apartment, believing both would be necessary for an investigation.

52.     Through Trevett, Stamper conveyed to Ms. Frelick that Orozco and Princeton Management would not take any action without a police report.

53.     Neither Orozco nor any higher up officials at Princeton Management ever interviewed Ms. Frelick directly regarding the assault.

54.     No representative of Princeton Management ever provided Ms. Frelick with written acknowledgment of her complaint.

55.     No representative of Princeton Management ever offered Ms. Frelick alternative housing following the assault.

56.     Ms. Frelick told Stamper that she was afraid Hill still had access to her apartment.

57.     Stamper confirmed to Ms. Frelick that Hill likely still possessed keys to her unit.

58.     Princeton Management changed the lock on Ms. Frelick's personal unit door but did not change the lock on the exterior building entry door, to which Hill had access.

59.     Thus, Ms. Frelick remained frightened that Hill could readily enter her building and wait outside her door.

60.     What's more, Ms. Frelick's new key was placed in the same unsecured key storage area in the management office to which Hill had kept his keys even after he was moved to another apartment complex.

61.     When Ms. Frelick told Stamper she was afraid and had seen Hill driving through the apartment complex, Stamper's only response was that Hill was banned from the property — offering as reassurance the expectation that a man who had drugged and sexually assaulted her in her own home would follow a verbal instruction.

62.     Despite this meaningless assurance from Stamper, Ms. Frelick continued to live in a state of fear.

63.     There was good reason to fear, as Trevett reported to Stamper that after the assault on Ms. Frelick, Hill on multiple occasions sat in his car outsider Trevett's home, which is less than a quarter mile from the Embassy West apartments.

11

64.     Apparently because Hill knew that Trevett has assisted in reporting the assault on Ms. Frelick, Hill would sit in his car outside her home making obscene gestures and comments towards her, and then speeding off.

65.     Princeton Management did not suspend, terminate, or formally discipline Hill in any manner.

66.     Approximately four weeks after the assault, Princeton Management transferred Hill from Embassy West Apartments to Fox Pointe Apartments in Pontiac — a new property, with new tenants, and the same unsupervised key access Hill had previously.

67.     Hill was not required to return the keys to Embassy West Apartments when he left.

68.     Fox Pointe Apartments is also within Orozco's area of supervision.

69.     Fox Pointe Apartments also lacked a meaningful control system on the keys to residents' homes.

70.     When he arrived at Fox Pointe, Hill again sought attention and sympathy by claiming to be lonely and without friends.

71.     Hill's conduct at Fox Pointe Apartments included a sustained pattern of obscene arguments with coworkers, residents, and management.

72.     On information and belief, in or around March or April of 2025, Hill sexually assaulted a coworker who worked and resided at Fox Pointe Apartments.

73.     On information and belief, this coworker woke the morning after a dinner with Hill disoriented and partially unclothed on the floor of his living room, covered in what he believed to be Hill's vomit and urine.

74.     On information and belief, once the assault was reported to Fox Pointe property manager Jeanette Nogueras, she reported it to Area Director Orozco.

75.     Orozco again instructed Nogueras and the victim not to contact law enforcement regarding this assault.

76.     Upon information and belief, Hill stalked a nurse who resided at Fox Pointe Apartments to the point where she felt compelled to file a police report against Hill.

77.     Orozco and Princeton Management did not terminate Hill following the assault or the stalking incident.

78.      Instead, Orozco and Princeton Management, moved Hill again to a fourth apartment complex, Pine Lake Apartments.

79.      Hill continues to be employed at Pine Lake Apartments.

80.      Hill continues to exhibit problematic and combative behavior toward coworkers at Pine Lake Apartments.

81.      Hill has spoken openly and boastfully to other maintenance crew members of the assaults he has perpetrated at Princeton Management apartments.

82.      The fact of these sexual assaults is an open and widely known "secret" among Princeton Management employees.

83.      Ms. Frelick lives under constant fear that Hill remains employed by the same company that owns her home, that he has never been terminated or formally disciplined, and that Princeton Management has repeatedly chosen to move him rather than remove him.

84.      Ms. Frelick lives under the constant stress that the man who drugged and assaulted her in her own home continues to operate within the same property management network, with the same type of key access that allowed him to enter the apartment he assaulted her in once before.

85. Ms. Frelick has experienced multiple trauma-related panic attacks since the assault, one of which required hospitalization.

86. Ms. Frelick suffers ongoing fear, anxiety, and psychological harm as a direct result of both the assault and Princeton Management's repeated, deliberate choice to shield Hill from consequences and return him to positions of access over residential tenants.

87. As a result of Orozco and Princeton Management's acts, failures to act, and practices, Ms. Frelick cannot enjoy the basic security of her own home.

88. Orozco and Princeton's Management's acts, failures to act, and practices have left Ms. Frelick without meaningful protection in the place she lives.

### COUNT I —FAIR HOUSING ACT, 42 U.S.C. § 3601 et seq.
### Hostile Housing Environment and Continuing Violation

89. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

90. The Fair Housing Act prohibits discrimination in the terms, conditions, or privileges of the rental of a dwelling on the basis of sex,

15

including sexual assault, because that creates an inherently hostile housing environment. 42 U.S.C. § 3604(b).

91.     Hill's conduct, as described herein, constituted sexual harassment that created a hostile housing environment for Ms. Frelick within the meaning of the FHA.

92.     Princeton Management and Orozco employed Hill, granted him authorized access to her unit, received notice of the assault, and then failed to take adequate remedial action in response to this knowledge.

93.     Defendants' having retained Hill, despite knowledge of his having sexually assaulted Ms. Frelick, allowed him to retain portfolio-wide key access, failed to terminate him or revoke his access, and transferred him to a new property where he raped a second tenant constitutes a continuing violation of the FHA.

94.     Thus, Princeton Management's wrongful conduct continued after the assault on Ms. Frelick because it failed to protect her from the specter of Hill's danger to her.

95.     Ms. Frelick has lived under the fear that at any time, through Defendants' accumulated failures, Hill could gain access to her home and assault her again.

16

96.     This further injury to Ms. Frelick—of constant fear of this sexual predator employed by Princeton Management—was avoidable had Defendants terminated Hill and revoked his access at any point.

97.     Defendants' unlawful practice of creating a hostile housing environment has not terminated, as Hill remains employed and in possession of access to her home.

98.     Hill's subsequent assault of a second Princeton Management resident following his transfer to Fox Pointe further demonstrates his danger to Ms. Frelick and others.

99.     As a direct and proximate result of Defendants' violations of the FHA, Ms. Frelick has suffered and continues to suffer damages in an amount to be determined at trial.

**COUNT II —ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq.,**
**Hostile Housing Environment**

100.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

101.    The Elliott-Larsen Civil Rights Act prohibits any person, which can be a business entity or an individual, from creating a hostile housing environment by imposing "unwelcome sexual advances, requests for

17

sexual favors, and other verbal or physical conduct or communication of a sexual nature" on an individual. MCL 37.2103(k); MCL 37.2502.

102. Hill, as an employee of Princeton Management, falsely gained Ms. Frelick's trust in order to subject her to sexual assault, including drugging her without her consent and sexually assaulting her in her home.

103. Hill's conduct had the purpose and effect of substantially interfering with Ms. Frelick's quiet enjoyment of her home and housing and creating an intimidating, hostile, and offensive housing environment within the meaning of MCL 37.2103(k)(iii).

104. A single incident of rape constitutes a sufficient basis to establish a hostile housing environment under the ELCRA. *Radtke v. Everett*, 501 N.W.2d 155, 168 (1993).

105. By the time Hill was reassigned from Grosvenor North to Embassy West Apartments, Defendants already knew that Hill was a dangerous and unstable employee.

106. Nonetheless, Defendants reemployed Hill and granted him unsupervised key access to Ms. Frelick's unit as part of his job duties.

107.     After Defendants received notice of the assault, they failed to take adequate remedial action, which left Ms. Frelick terrified of Hill's unfettered access to her apartment complex and even her home.

108.     Princeton Management's ultimate response to the report of the sexual assault— transferring Hill to another property without terminating his employment, revoking his key access, or imposing any discipline—did not reasonably serve to prevent future harassment and harm to Ms. Frelick.

109.     Hill's subsequent sexual assault of a second resident at the property to which he was transferred is direct evidence that Princeton Management's response failed to prevent future harm and did not constitute an adequate remedial measure.

110.     As a direct and proximate result of Defendants' violations of the ELCRA, Ms. Frelick has suffered and continues to suffer damages in an amount to be determined at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Ms. Frelick respectfully requests that this Court:

19

A.  Declare that Defendant has violated the Fair Housing Act and Elliott-Larsen Civil Rights Act, as alleged above;

B. Enter judgment in favor of Plaintiff and against Defendant on all counts;

C.  Award compensatory damages in an amount to be determined at trial, including damages for emotional distress, pain and suffering, loss of enjoyment of life, medical and psychological treatment expenses, and all other economic and non-economic damages proximately caused by Defendant's conduct;

D. Award punitive damages against Defendant for its intentional and knowing disregard for the dangers it created to Plaintiff and others in violation of Ms. Frelick's rights to be free from sexual assault and fear of the same at her home;

E.  Issue preliminary and permanent injunctive relief requiring Princeton Management to terminate Dennis Rae Hill's employment, revoke his access to all.

F.  Princeton Management properties, change all locks at Embassy West Apartments and any other property at which Hill worked, and implement an adequate sexual harassment remediation policy across its entire portfolio;

20

G. Award reasonable attorney's fees and costs pursuant to MCL 37.2801

and 42 U.S.C. § 3613(c)(2); and

H. Grant such other and further relief as this Court deems just and proper.

Respectfully Submitted by:

*/s/Robin B. Wagner/*
Robin B. Wagner P79408
Attorney for Plaintiff
Robin Wagner Law, PLLC
402 W. Liberty Street, rear
Ann Arbor, MI 48103
734-294-3035 (phone & fax)
robin@robinwagnerlaw.net

July 10, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| Kellie Frelick, | |
| Plaintiff, | Case No. _____ |
| v. | Hon. _____<br>United States District Judge |
| Princeton Enterprises, LLC d/b/a<br>Princeton Management, and<br>Alejandra Orozco, jointly and<br>individually, | Hon. _____<br>United States Magistrate Judge |
| Defendants. | |

**JURY DEMAND**

Plaintiff Kellie Frelick hereby demands a trial by jury.

Respectfully Submitted by:

*/s/Robin B. Wagner/*
Robin B. Wagner P79408
Attorney for Plaintiff
Robin Wagner Law, PLLC
402 W. Liberty Street, rear
Ann Arbor, MI 48103
734-294-3035 (phone & fax)
robin@robinwagnerlaw.net

July 10, 2026

22